BENTON, J.,
with whom ELDER, J., joins, dissenting.
When a defendant files a motion to suppress a statement and alleges a Miranda violation, the Commonwealth bears the burden of proving that the defendant waived his Miranda rights. Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) (per curiam) (citing Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966)). The evidence in this case is demonstrable that Earing Bethel Medley did not waive his Miranda rights and that the Commonwealth failed in its burden to prove he did. Indeed, when, as in this case, a trial judge finds that the defendant “didn’t waive his rights,” we are bound by that finding of historical fact unless it is “plainly wrong” or “without evidence to support [it].” McGee v. Commonwealth, 25 Va.App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc). See also Chawla v. BurgerBusters, Inc., 255 Va. 616, 622-23, 499 S.E.2d 829, 833 (1998) (defining waiver); Stewart v. Common *40 wealth, 245 Va. 222, 231, 427 S.E.2d 394, 401 (1993) (holding that waiver is a question of fact). I therefore dissent.
I.
Medley unambiguously invoked his Miranda rights when police began interrogating him. Even after repeated police attempts, Medley refused to waive those rights.
The evidence proved that Medley was in custody in a police officer’s vehicle and in handcuffs when Special Agent Wendell began interrogating him. After Special Agent Wendell read Miranda rights to Medley, he asked Medley if he understood those rights. Medley said he did. When Special Agent Wendell asked Medley if he wished to waive those rights and talk with him, Medley responded that “he would talk to [Special Agent Wendell], but he didn’t want to waive his rights.”
Although the record does not contain the precise language ... [used to convey] the Miranda rights, those rights typically are worded to inform an accused as follows:
MIRANDA WARNING
1. You have the right to remain silent.
2. Anything you say can and will be used against you in court.
3. You have the right to talk to a lawyer and have him present while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you, without cost, before any questioning, if you desire one.
McDaniel v. Commonwealth, 30 Va.App. 602, 606, 518 S.E.2d 851, 853 (1999) (en banc). See also Harrison v. Commonwealth, 244 Va. 576, 578, 423 S.E.2d 160, 161 (1992). When Special Agent Wendell continued to talk to Medley and “asked him which rights ... he wanted to invoke,” Medley “said he wanted all of his rights.” Given this context in which the officer had just advised Medley of these four specific rights, *41 nothing is ambiguous about Medley’s response. He invoked each of the four rights as itemized.
Rather than accepting Medley’s invocation of his “rights” and ceasing the interrogation, Special Agent Wendell continued to interrogate Medley. He testified that the following occurred:
For several minutes I continued to talk to Mr. Medley saying I read him his Miranda rights. I asked him which rights he wished — that he wanted to invoke, and he said he wanted all of his rights. I told him that I cannot talk to him because of the third right — you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with — excuse me — with you during questioning; and at that time he stated, I want all my rights, but I still want to talk to you. I again explained to him, I cannot talk to you — and I overemphasized that I cannot talk to him at all without having his waiver of rights; and he said, I don’t want to waive anything on this. I want this sheet to remain the same — and this would be the sheet that I marked yes and then no — but I will talk to you.
I acknowledge the Supreme Court’s recognition that “good practice suggests that the police should attempt to clarify ambiguous statements,” Midkiff v. Commonwealth, 250 Va. 262, 266, 462 S.E.2d 112, 115 (1995) (citing Davis v. United States, 512 U.S. 452, 460-61, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994)), however, the facts in this case show that the encounters between Medley and the police went beyond mere clarification. Medley’s statement that “he wanted all of his rights” was not ambiguous. Indeed, Special Agent Wendell specifically acknowledged at trial that he understood Medley invoked his right to an attorney and did not want to talk without a lawyer. Although he knew Medley had not waived his rights, he continued his efforts to elicit a waiver.
To assist in obtaining a waiver, Special Agent Wendell asked Sergeant Clark to join him and talk to Medley. He described their extensive efforts as follows:
*42 At that particular point in time after minutes and numerous times trying to explain about I cannot talk to him if he does not -wish to waive them, I brought Sergeant Clark in. Sergeant Clark and I both tried to explain over and over again to him that if he wishes to enact his Miranda rights, I cannot talk to him; and at that time Sergeant Clark also advised him of that. From that standpoint, Sergeant Clark and I closed the door — I closed the door myself; and Sergeant Clark advised him that if he wants to talk to us, he’s going to have to initiate the conversation for us to continue to talk to him.
Sergeant Clark confirmed that, after he joined Special Agent Wendell and again explained the Miranda rights to Medley, Medley responded that he understood his rights and said he “did not want to waive his rights, but ... would talk to us.” Sergeant Clark testified that after trying three more times, he told Medley that Medley would have to initiate the conversation otherwise they would not talk to him anymore. Special Agent Wendell and Sergeant Clark then left Medley alone in the vehicle. At that point, both officers knew that Medley refused to waive his Miranda rights.
Special Agent Wendell joined the other officers who were searching the passenger’s automobile, and he told Trooper Hawkins that Medley “didn’t give a statement.” Nevertheless, after only a momentary cessation, Trooper Hawkins entered the vehicle and renewed the attempt to get a statement. Trooper Hawkins, the third officer to violate Medley’s election to terminate questioning, began by repeating for at least the third time, the Miranda rights as follows:
You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present while you’re being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one; and then I always go into the waiver. Do you understand each of these rights I’ve explained to you? And having these rights in mind, do you wish to talk to us now? He would never go into with me—
*43 Q: Don’t paraphrase or describe. Tell me exactly what he said to you.
A: I don’t know verbatim how he responded to that; but I know it was to the point that he did not want to talk to me at that point, so I cut my conversation off then.
Q: You understood then that Mr. Medley did not waive his Miranda rights?
A: With me, he did not.
Trooper Hawkins farther explained as follows:
I sat back with Mr. Medley for a little while after his Miranda warnings were read to him. Special Agent Wendell had read them, and I had read them again, and he wasn’t talking at that point when I was with him. He just said that everything — when I read them to him, he would say — he wouldn’t say that he understood his rights. He wouldn’t go that far with me.
When I talked to him, he — he wouldn’t — when I asked him the question about will you waive your rights, he would never say I waive my rights. He would go as far as acknowledging his understanding; but he would not say, I waive my rights.
He testified that he then “determined, unless [Medley] approached [him] and wanted to talk to [him] again, [he] wasn’t going to have any more conversation.”
Special Agent Wendell testified that, within a half an hour of his departure from seeking a statement from Medley, Trooper Hawkins came to him and said, “he wants to talk to you.” The record contains no testimony from Trooper Hawkins about the circumstances which gave rise to the conversation with Medley and which led Trooper Hawkins to seek out Special Agent Wendell. The record clearly establishes, however, that when Special Agent Wendell returned to the vehicle to re-interrogate Medley, less than a half hour had lapsed from his initial efforts. Thus, during a half-hour period Medley had been given at least three sets of Miranda warnings and subjected to interrogation by Trooper Hawkins, *44 Sergeant Clark, and twice by Special Agent Wendell. At no time did Medley say he was waiving his Miranda rights. Indeed, Medley said at all times and on each reading of his Miranda rights that he would not waive his rights.
Special Agent Wendell testified that the following occurred.
I then proceeded back to the vehicle and asked Mr. Medley, Do you want to talk to me? He said, Yes, I want to talk to you.
I again explained to him, if you’re not willing to waive your rights, I cannot talk to you. He said, I — quote and unquote — Mr. Medley stated that he could talk to me because [the passenger] had nothing to do with the investigation. I then explained to Mr. Medley, I don’t want to talk to you unless you’re willing to waive your rights; and he said, I’ll talk to you. I just don’t want anything to be used against me. I’ll talk to you off record, and I told him that he cannot talk to me off the record because he invoked his rights. Again, he consistently told me that he wanted to talk to me; and, therefore, I began talking to him.
Denying Medley’s motion to suppress his statements, the trial judge made the following ruling:
I think [the officers] had a right to stop him, and ... if you believe [Medley’s] testimony, he didn’t make any statements. So there is nothing to be suppressed. If you believe the officer’s testimony, he didn’t waive his rights; but he initiated the conversation. So I would overrule the motion.
II.
I would hold that the Commonwealth failed to prove Medley waived his Miranda rights. I would further hold that the conduct of the officers violated both Medley’s right to remain silent and his right to have the questioning ceased until he had consulted an attorney.
The majority is correct that Medley never specifically mentioned his “right to counsel.” Special Agent Wendell did *45 testify, however, that he told Medley he could “not talk to him because of the third right — you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with ... you during questioning.” Special Agent Wendell also testified that Medley responded to that comment by saying, “I want all my rights.” Therefore, Special Agent Wendell, who was the first officer to read Miranda rights to Medley, was aware that Medley did not want to waive his right to talk to his attorney before being interrogated. In view of this circumstance, Special Agent Wendell and any other reasonably trained officer certainly “ Vould understand the statement to be a request for an attorney.’ ” McDaniel, 30 Va.App. at 605, 518 S.E.2d at 853 (citation omitted). The record further reflects that after Sergeant Clark and Trooper Hawkins read Miranda rights to Medley, Special Agent Wendell returned to the vehicle and again questioned Medley. He was fully aware of Medley’s earlier refusal to waive his right to an attorney, and he initiated the interrogation with full knowledge that the other two officers had conversed with Medley and were unsuccessful in their attempts to obtain Medley’s waiver.
The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates ... [that] the waiver [of the right] is made voluntarily, knowingly and intelligently. If ... he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.
Miranda, 384 U.S. at 444-45, 86 S.Ct. at 1612 (emphasis added). The violation in this case is patent.
*46 III.
The trial judge’s assertion that Medley “initiated the conversation” ignores the evidence which shows that the police failed to “scrupulously honor” Medley’s request to remain silent and his repeated assertion that “he wanted all his rights.” Noting that Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), has been misapprehended, the Supreme Court of the United States explained its ruling as follows:
We did not there hold that the “initiation” of a conversation by a defendant such as respondent would amount to a waiver of a previously invoked right to counsel; we held that after the right to counsel had been asserted by an accused, further interrogation of the accused should not take place “unless the accused himself initiates further communication, exchanges, or conversations with the police.” 451 U.S., at 485, 101 S.Ct., at 1885. This was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in Edwards was....
But even if a conversation taking place after the accused has “expressed his desire to deal with the police only through counsel,” is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation....
Thus, the ... Court of Appeals was wrong in thinking that an “initiation” of a conversation or discussion by an accused not only satisfied the Edwards rule, but ex proprio vigore sufficed to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together.
Oregon v. Bradshaw, 462 U.S. 1039, 1044-45, 103 S.Ct. 2830, 2834-35, 77 L.Ed.2d 405 (1983) (citations omitted).
*47 Medley argued on brief, as he did at trial, that the trial judge must determine: “First ... whether the accused unequivocally invoked his right to counsel. Second, ... whether the accused rather than the authorities initiated further discussions____Third, if the accused did initiate further discussions ...[,] whether the accused knowingly and intelligently waived the previously invoked right to counsel.” He argues, and the Supreme Court has held, the Fifth Amendment right against self-incrimination protects an accused as follows:
“Once [Miranda] warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.” 384 U.S. at 473-74, 86 S.Ct. at 1627-28.
* * * * * ❖
A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt “fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored____” 384 U.S. at 479, 86 S.Ct. at 1630. The critical safeguard identified in the passage at issue is a person’s “right to cut off questioning.” Id. at 474, 86 S.Ct. at 1628. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person’s exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided *48 to remain silent depends under Miranda on whether his “right to cut off questioning” was “scrupulously honored.”
Michigan v. Mosley, 423 U.S. 96, 100-04, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313 (1975) (footnotes omitted).
The evidence clearly establishes that the officers made repeated efforts to elicit a waiver after Medley said he understood his rights and did not want to waive any of them. In addition, no evidence proved that Medley initiated contact, communication, or exchange with Sergeant Clark or Trooper Hawkins. Special Agent Wendell brought Sergeant Clark to question Medley even after Medley said he would not waive his rights. Trooper Hawkins testified that he initiated his exchange with Medley after Special Agent Wendell said Medley “didn’t give a statement.” Indeed, all of the officers testified that Medley communicated to them that he did not wish to waive his rights. Each officer who questioned him within that half-hour period also knew Medley previously had received Miranda warnings. Thus, the record clearly established that Medley’s right to not be further questioned was not “scrupulously honored.” Mosley, 423 U.S. at 104, 96 S.Ct. at 326. This pattern of repeating Miranda warnings to Medley and then questioning him about his intent represents a “continuation of custodial interrogation after a momentary cessation,” which the Supreme Court has recognized as conduct that “would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned.” Mosley, 423 U.S. at 102, 96 S.Ct. at 326.
Although the evidence does not prove Medley initiated the conversation with the officers, even if he had the Supreme Court has held that such an initiation does not act as a waiver. Bradshaw, 462 U.S. at 1044-45, 103 S.Ct. at 2834-35. The trial judge was in error when he assumed that it did because Bradshaw requires a two-pronged analysis. Once the trial judge found that Medley initiated conversation, he then was required to determine if Medley knowingly and voluntarily waived his Miranda rights. There was no such showing.
*49 Moreover, even if Medley implicitly waived his Miranda rights by talking with police, demonstrating such an “implied waiver” is a much harder standard for the Commonwealth to meet. An implied waiver requires a “clear and unmistakable proof of the intention to waive such right, for the essence of waiver is voluntary choice.” Chawla, 255 Va. at 623, 499 S.E.2d at 833 (emphasis added). This higher standard to show an implied waiver is in keeping with the Edwards prophylactic function: to keep police from badgering a suspect once he has invoked his rights. As the United States Supreme Court has emphasized, once an accused has “ ‘expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities’ insistence to make a statement without counsel’s presence may properly be viewed with skepticism.’ ” Arizona v. Roberson, 486 U.S. 675, 681, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988) (quoting Mosley, 423 U.S. at 110, n. 2, 96 S.Ct. at 329, n. 2).
Finding a confession inadmissible, the Supreme Court recently reiterated the explanation it gave in Miranda, “that the “voluntariness doctrine ... encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice.’ ” Missouri v. Seibert, — U.S.-,-, 124 S.Ct. 2601, 2607, 159 L.Ed.2d 643 (2004) (quoting Miranda, 384 U.S. at 464-65, 86 S.Ct. at 1622-23). The Court noted that “it would be absurd to think that mere recitation of the [warning] litany suffices to satisfy Miranda in every conceivable circumstance,” id. at 2610, and the Court warned against approving a “police strategy adapted to undermine the Miranda warnings.” Id. at 2612. As the Court noted in Seibert, some officers are now trained “to continue questioning after the suspect invokes his rights.” Id. at 2609 n. 2.
This training is reflected in the reported cases involving deliberate questioning after invocation of Miranda rights. See, e.g., California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1042-1044 (C.A.9 2000); Henry v. Kernan, 197 F.3d 1021, 1026 (C.A.9 1999); People v. Neal, 31 Cal.4th *50 63, 68, 1 Cal.Rptr.3d 650, 72 P.3d 280, 282 (2003); People v. Peevy, 17 Cal.4th 1184, 1189, 73 Cal.Rptr.2d 865, 953 P.2d 1212, 1215 (1998). Scholars have noted the growing trend of such practices. See, e.g., Leo, Questioning the Relevance of Miranda in the Twenty-First Century, 99 Mich. L.Rev. 1000, 1010 (2001); Weisselberg, In the Stationhouse After Dickerson, 99 Mich. L. Rev. 1121, 1123-1154 (2001).

Id.

This case presents just another example of an interrogation strategy designed to undermine Miranda. Simply put, the officers in this case sought by their repeated approaches to undermine Medley’s resolve not to waive his Miranda rights after he declared that “he wanted all of his rights.” Within less than a half hour, three officers “persisted in repeated efforts to wear down [Medley’s] resistance and make him change his mind.” Mosley, 423 U.S. at 105-06, 96 S.Ct. at 327. In view of Medley’s express intention to exercise his Fifth Amendment privilege, the statement taken from him after officers questioned him on four occasions within a half hour “cannot be other than the product of compulsion, subtle or otherwise.” Miranda, 384 U.S. at 474, 86 S.Ct. at 1628. In view of the Supreme Court’s warning in Miranda “that ‘illegitimate and unconstitutional practices get their first footing ... by silent approaches and slight deviations from legal modes of procedure,’ ” 384 U.S. at 459, 86 S.Ct. at 1620 (quoting Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886)), I would hold that the persistent questioning on four occasions within a half hour by officers who read Miranda rights to Medley on at least three of those occasions demonstrated that Medley’s refusal to waive his rights was not “scrupulously honored.”
IV.
For these reasons, I would hold that the trial judge erred in denying the motion to suppress Medley’s statements and I would reverse the convictions and remand for a new trial.